UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JOAN GINSBERG,                           :
                                         :
                          Plaintiff,     :          **OPINION AND ORDER**
                                         :              05 CV 3696
            -against-                    :
                                         :
MICHAEL J. ASTRUE,                       :
COMMISSIONER, SOCIAL SECURITY            :
ADMINISTRATION,                          :
                                         :
                          Defendant.     :
-------------------------------------------------------x

**IRIZARRY, DORA L., United States District Judge:**

Plaintiff Joan Ginsberg ("Plaintiff") appeals from the final decision of the Commissioner of the Social Security Administration (the Commissioner") denying Plaintiff disability insurance benefits under the Social Security Act (the "Act"). Plaintiff now moves for judgment on the pleadings, and the Commissioner, in turn, cross-moves for judgment on the pleadings. For the reasons set forth below, the Commissioner's motion is denied, and Plaintiff's motion is granted to the extent that this case is remanded for further proceedings in accordance with the discussion and findings described below.

**I.      Background**

**A.      Procedural History**

Plaintiff applied for disability insurance benefits on January 14, 2002, alleging that she had been disabled since June 11, 2001 due to Chronic Fatigue Syndrome ("CFS"). (A.R.[1] 17-19.) The application was denied. (A.R. 4-8.) Plaintiff then requested a hearing, which was held before Administrative Law Judge ("ALJ") David Nisnewitz on March 11,

---

[1]"A. R. refers to the Administrative Record filed with this court on August 8, 2005.

2004.  (*See* A.R. 281-341.)  Subsequently, the ALJ held another hearing on November 3, 2004.  (*See* A.R. 244-80.)  On April 1, 2005, the ALJ found that Plaintiff was not disabled, as defined by the Act, because she was able to perform her past relevant work, and was therefore not entitled to disability benefits.  (A.R. 3F-3Q.)  The Appeals Council denied Plaintiff's request for review on June 30, 2005, at which time the ALJ's decision became final.  (A.R. 3A-3E.)  Plaintiff timely commenced the instant appeal.  Although Plaintiff is now represented by counsel, she was not represented by legal counsel for the proceedings below.

### B.      Facts and Applicable Regulations

### 1.      Plaintiff's Age, Education, and Work Experience

Plaintiff was born on July 11, 1953, and was forty-eight years old at the onset of the alleged period of disability.  (A.R. 283, 35.)  Plaintiff has attended college and one year of graduate school.  (A.R. 283-84.)  Since college, Plaintiff has worked as a proofreader, a paralegal, a copy editor, and a production clerk  (A.R. 36, 44-50.)  At the March 11, 2004 hearing, Amy Leopold, an impartial vocational expert, testified that Plaintiff's past work as a proofreader, paralegal, copy editor, and production clerk were all classified as sedentary, skilled work.  (A.R. 338.)

In 1995, Plaintiff began freelancing as a proofreader for the Home Box Office ("HBO") approximately ten hours per week.  (A.R. 286-87.)  Plaintiff's job at HBO involved seven hours of sitting and one hour of walking for each day she worked, and lifting less than ten pounds.  (A.R. 36.)  According to Plaintiff, she began to experience symptoms of CFS in May 2001, which caused her to commit errors in her work.  (A.R. 35.)  Because of these errors, Plaintiff was fired from HBO in August 2003.  (A.R. 286-87, 324-25.)

Since she was fired from HBO, Plaintiff has been doing some light proofreading work from home, apparently amounting, on average, to a few hours per week (up to an hour or an hour-and-a-half at a time). (A.R. 285, 292; 212-14.) Her proofreading projects are delivered to her at her home. (A.R. 285.) Some days she cannot work at all because of what she describes as extreme exhaustion, dizzy spells, and muscle aches. (A.R. 292-93.) Plaintiff reports that there are times when she is completely bedridden and, thus, unable to work at all. (A.R. 292-93.) Plaintiff has been collecting unemployment insurance benefits for the loss of her part-time work since August 2003. (A.R. 286.)

### 2. Plaintiff's Home Life, Symptoms, and Treatment

Plaintiff describes her life prior to the onset of her alleged disability as very active. (A.R. 309.) She used to take dance classes regularly and frequently rode her bicycle. (A.R. 309.) However, Plaintiff states that, since May of 2001, she has experienced extended periods of weakness, dizziness, muscle pain, exhaustion, mental confusion, and lightheadedness, resulting in mobility and concentration problems. (A.R. 35, 312-14, 316-17, 309-10, 292-93.)

Plaintiff lives alone and prepares simple meals for herself, although she orders food for delivery when she feels too weak to cook. (A.R. 52, 54, 284, 308.) She can shop on her own for no more than two or three items, and at times her neighbors assist her with the shopping. (A.R. 308.) Plaintiff cannot carry more than a quart of milk or two-pound hand weights, and she cannot walk further than two-to-three city blocks without rest. (A.R. 311-12, 309-10.) However, she does attempt to take walks outside on occasion when she feels up to it. (A.R. 256.) She is unable to keep her apartment clean and does not vacuum, sweep, or scrub, but she does light housekeeping, laundry when she can, ironing, and she

makes her bed and washes dishes when necessary.  (A.R. 308-09, 55.)

Plaintiff visits with friends and family on a monthly basis, sometimes less often, but she primarily speaks with her friends by telephone due to her lack of energy and her physical weakness.  (A.R. 57, 62, 312.)  Her brother lives in Spring Valley in upstate New York, and, when Plaintiff visits him, he usually picks her up and takes her to his home.  (A.R. 291-92.)  She has also vacationed in Amagansett on Long Island in New York with a friend who drives her out there.  (A.R. 292.)  However, she travels to Amagansett far less now because of lack of funds.  (A.R. 292.)

Since 1981, Plaintiff has seen Lucille Barish, C.S.W., for depression and anxiety.  (A.R. 296-97.)  Sessions with Ms. Barish are often conducted over the telephone, as it is often too difficult for Plaintiff to travel to Ms. Barish's office.  (A.R. 316, 298.)  Ms. Barish referred Plaintiff to Dr. Susan Levine, whom Plaintiff has seen for her condition since around 1996 or 1997.  (A.R. 305-06.)  Plaintiff travels to Dr. Levine's office by bus, as it is not too far from her home, unlike Ms. Barish's office.  (A.R. 316.)  For treatment, Plaintiff receives gamma globulin and vitamin shots from Dr. Levine, as Plaintiff cannot tolerate most medications.  (A.R. 307, 124.)  In addition, Plaintiff has taken Tylenol for the pain, Sudafed for headaches, vitamins and herbs, and she has also received acupuncture treatment.  (A.R. 61, 63, 69, 257.)

### 3.  Primary Medical Evidence

#### a.  Treating Physician Susan M. Levine, M.D.

At the time of Plaintiff's first hearing before the ALJ on March 11, 2004, Plaintiff had been seeing Dr. Susan M. Levine for the prior seven to eight years, with more frequent visits of every week or every other week beginning in 2001.  (A.R. 305-06; 124.)

Apparently, all of Dr. Levine's patients have CFS. (A.R. 275.) In a report dated February 11, 2002, Dr. Levine wrote the following:

> Plaintiff has been under my care for the Chronic Fatigue Syndrome (CFS) for the last 4 years. She developed a gradual onset of fatigue; malaise; sore throats and cognitive problems in 1997 and the diagnosis of CFS was subsequently confirmed by myself after excluding other disorders, such as thyroid, lupus, rheumatoid arthritis and lyme disease after excluding other disorders with similar presentations. She had evidence of prior exposure to Human Herpes Virus 6, an agent that has been associated with CFS.

(A.R. 124.) Dr. Levine further noted that, in June 2001, Plaintiff's symptoms of fatigue, malaise, and cognitive problems, including short term memory difficulties and difficulty concentrating became "completely disabling." (A.R. 124.) Plaintiff complained of "headaches, sinus congestion, dizziness and vertigo, palpitations, muscoloskeletal pain in the shoulders, neck and upper back; and gastrointestinal disturbances, including bloating and intermittent diarrhea." (A.R. 124.) The doctor reported that Plaintiff primarily has taken supplements, as she cannot tolerate most medications due to a sensitive stomach. (A.R. 124, 333, 335.) Despite prolonged bed rest, the doctor further reported, Plaintiff "is still not able to stand for more than 10-15 minutes at a time; walk more than several blocks without stopping; travel long distances by herself; and read or write for long periods due to her cognitive problems." (A.R. 124.)

In her February 11 report, Dr. Levine also wrote that, during a physical examination of Plaintiff three days before, Plaintiff displayed "normal vital signs; a red throat, bilaterally enlarged anterior cervical lymph nodes and a normal chest, heart, lung, and abdominal exam." (A.R. 124.) A musculoskeletal exam revealed the presence of trigger points in several locations. (A.R. 125.) Dr. Levine concluded that, "based on [her] wide experience in following and treating patients with [CFS]," Plaintiff's prognosis was poor, and Dr.

Levine thus recommended "total disability for an indefinite period of time." (A.R. 125.)

In reports dated March 5 and June 7, 2002, Dr. Levine confirmed her diagnosis that Plaintiff suffered from CFS. (A.R. 119, 118.) On March 5, Dr. Levine wrote that Plaintiff was also suffering from the related condition of fibromyalgia and was "unable to stand, walk, lift or carry packages for more than a few minutes at a time based on objective evidence of loss of muscle strength." (A.R. 119.) On March 6, Dr. Levine reported that Plaintiff "has the following symptoms which are debilitating: severe exhaustion; sore throats; muscle and joint pains; and sleep disturbances" and that "due to her profound fatigue, muscle and joint weakness and pain, and her cognitive problems[,] I deem her prognosis to be poor." (A.R. 118.) In addition, in both reports, Dr. Levine discussed attached laboratory results revealing that Plaintiff showed a "'blunted' response to Growth Hormone stimulation[,] a common finding among a subset of patients with the Chronic Fatigue Syndrome (CFS). The absence of this brain chemical contributes to the patient's lack of energy and chronic insomnia." (A.R. 113, 119, 118, 120-23.) In each of her reports, Dr. Levine reiterated her conclusion that Plaintiff was completely disabled for an indefinite period of time. (A.R. 119, 118, 113.)

In a report dated October 18, 2002, Dr. Levine stated that there had not been any progress in Plaintiff's condition. (A.R. 112.) Plaintiff continued to complain of "severe exhaustion which lasts up to 24 hours a day; muscle and joint pains; headaches; cognitive problems; low grade fevers; sore throats and sleep disturbances." (A.R. 112.) Commenting on the impact of these symptoms on Plaintiff's functioning, Dr. Levine noted that, "[d]ue to her fatigue[,] she is unable to stand for long periods of time; she cannot walk more than 2-3 blocks without stopping; she cannot climb more than a flight of stairs without stopping; and

she cannot push or pull objects weighing more than 10 pounds no more than 20 feet at a time." (A.R. 112.)  Additionally, "[d]ue to her cognitive problems[, Plaintiff] has difficulty reading and understanding even simple materials and cannot participate in lengthy in person or phone conversations, as she gets easily confused." (A.R. 112.)  Dr. Levine concluded that Plaintiff's prognosis was poor and that she continued to recommend total disability for an indefinite period of time. (A. R. 112.)

On February 26, 2004, Dr. Levine reported that Plaintiff's condition "remains completely unchanged from previously.  She is completely disabled for an indefinite period of time." (A.R. 127.)

Dr. Levine also provided the progress notes she had taken, from January 6, 2003 to March 29, 2004, on Plaintiff's condition based on numerous physical examinations of Plaintiff, as well as Plaintiff's complaints.  (*See* A.R. 128-41, 147-77.)  Dr. Levine's physical examinations revealed repeated instances of red throat, enlarged and swollen cervical lymph nodes, joint pain, and fevers throughout this time period. (A.R. 128-41, 147-77.)  In addition, according to the progress notes, Plaintiff consistently complained of fatigue, especially after exertion, which was not improved by rest; sore throat; headaches; muscle pain; sinus congestion; lightheadedness; cognitive problems such as short-term memory loss and inability to concentrate; and sleep disturbances.  (A.R. 128-41, 147-77.)  The doctor also noted a growth hormone deficiency.  (A.R. 128, 165.)  Dr. Levine administered to Plaintiff gamma globulin injections and vitamin infusions, and prescribed daily five milligram doses of Lexapro.  (*E.g.*, A.R. 159, 165.)  The doctor noted that the gamma globulin injections helped improve Plaintiff's level of fatigue.  (A.R. 170.)

### b. Treating Therapist Lucille Barish, C.S.W.

Lucille Barish, Plaintiff's therapist and representative at the proceedings before the ALJ, began therapy sessions with Plaintiff starting 1981, sometimes weekly and sometimes infrequently (three or four times per year).  (A.R. 297.)  Ms. Barish chronicled Plaintiff's complaints in notes from sessions with Plaintiff.  (*See* A.R. 180-210.)  The handwriting in Ms. Barish's notes is difficult to decipher, and Ms. Barish did not provide the ALJ with a typed version of the notes.  However, based on a questionnaire Ms. Barish filled out on February 4, 2002, as well as what the ALJ could make out from Ms. Barish's notes, Plaintiff complained to Ms. Barish of the following symptoms on a recurring basis: fatigue, weakness, muscle pain, exhaustion, dizziness, anxiety, depression, fear, sadness, problems concentrating, either insomnia or excessive sleeping due to pain, feeling "very ill," difficulty grooming, keeping house, and cooking, problems socializing due to tiredness, and limited memory.  (A.R. 79, 81, 83-84, 180-210.)  In addition, in a questionnaire submitted to the Appeals Council, dated May 21, 2005, Ms. Barish recorded that Plaintiff was restricted in her daily activities and in her ability to maintain social functioning, noting episodes of deterioration in a work setting.  (A.R. 243.)  In the questionnaire, Ms. Barish wrote that Plaintiff could complete limited work on a timely basis at home.  (A.R. 243.) Sometime during 1996 or 1997, Ms. Barish referred Plaintiff to Dr. Levine.  (A.R. 293.)

The ALJ discounted Ms. Barish's assessment of Plaintiff's condition.   In his decision dated April 1, 2005, the ALJ concluded that, "[a]lthough Ms. Barish is an accepted medical source pursuant to 20 CFR 404.1513, her assessment and opinion of claimant's functional abilities are obviously based upon the claimant's subjective complaints and not supported by the clinical, objective and lack of diagnostic evidence."  (A.R. 3L.)

### c. Non-Examining Independent Medical Examiner Giancarlo Buganza, M.D.

Dr. Giancarlo Buganza, an independent medical examiner, reviewed the medical records in Plaintiff's file and testified at both the March 11, 2004 and the November 3, 2004 hearings before the ALJ. (*See* A.R. 326-37, 257-71.) Dr. Buganza is an internist and gastroenterologist. (A.R. 257-58.) He has treated fibromyalgia, but the record is unclear as to whether he has treated CFS. (A.R. 258.) At the March 11 hearing, Dr. Buganza stated that he needed more information to issue his opinion on Plaintiff's condition. (A.R. 332.) Accordingly, the ALJ scheduled a second hearing for November 3, 2004 and directed that, in the meantime, Plaintiff provide Dr. Buganza with all of Dr. Levine's records, as well as Ms. Barish's records dating from January 2000. (A.R. 336-37.) In response to the ALJ's order, Plaintiff submitted progress notes from Dr. Levine, dated from January 6, 2003 to March 29, 2004, and handwritten notes from Ms. Barish, dating back to January 2000. (*See* A.R. 128-41, 147-77, 180-210.)

At the second hearing on November 3, Dr. Buganza, having had the opportunity to review the additional materials, observed that, according to laboratory results, Plaintiff had "very low growth hormone" and a "markedly abnormal" result to a dehydroepiandrosterone ("DHEA") sulphate test. (A.R. 260.) When the ALJ inquired about the meaning of the tests, the following interchange occurred:

> ME [Medical Expert, referring to Dr. Buganza]: It means that probably there is something to do, you know, with out witness. Now, they found --
> ALJ: When you say "something to do," this is a Court. You have to be specific. Are there other causes of the elevation of that test?
> ME: Not that I know. (INAUDIBLE) but it has been in those articles that I mentioned to you, you know.
> ALJ: Has it been scientifically established that the elevation of this hormone has any connection to chronic fatigue syndrome?

9

ME: That I don't know.

ALJ: Because if it's not established, then it's worthless.

ME: I don't know. But certainly the fact that – may I read?

ALJ: Yeah. Go ahead.

ME: Given the many factors (INAUDIBLE) the axis – the (INAUDIBLE), pituitary axis, and chronic fatigue syndrome, such as sleep disturbance, psychiatric (INAUDIBLE), medication, and ongoing stress, it seems likely that the axis disturbance is heterogenous of (INAUDIBLE)

ALJ: But has that been established scientifically? You're not telling me that.

ME: You know, to establish scientifically I don't know.

ALJ: Let me see the language that you have there? There's a difference between a theory and an established – this is from an article. No. Listen to me. This is not – given the many factors that may implode on the HBA axis such as inactivity (INAUDIBLE), it seems likely this is not scientific data.

ME: But this is –

ALJ: We have a criteria here. Okay? Forget this. This is not what you go by. All right? I'm charging you under the law that we have – the Social Security Administration has a specific set of criteria that someone with chronic fatigue syndrome must meet.

(A.R. 260-62.)

The ALJ then described to Dr. Buganza the CFS criteria established by the Social Security Administration as requiring four of the following eight symptoms: (1) "[s]elf-reported impairment and short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, education, social, or personal activities," (2) "[s]ore throat, [(3)] tender cervical or axillary lymph nodes, [(4)] muscle pain," (5) "multi-joint pain without joint swelling or redness," (6) "[h]eadache of a new type[,] pattern, or severity," (7) "[u]nrefreshing sleep," and (8) "post-exertional malaise lasting more than 24 hours." (A.R. 262-63.) With respect to the required frequency of the four symptoms, the following dialogue took place:

ALJ: . . . [Plaintiff] has to have four of the[ eight listed symptoms] concurrently, that is documented for six months in the record. Now does Dr. Levine document that? I'm going to give you this, and if you have any questions you let me know. I want you to compare Dr. Levine's submissions, her records, with those four things – any of those four things – that must exist for six months consecutively.

10

> ME: All right.
> ALJ: And they have to all exist at the same time. All of the four, of any of those, have to exist at the same time, and it must be documented. And I've read Dr. Levine's records here.
> ME: (INAUDIBLE)
> ALJ: No, but it has to be – you can't mention it once. It has to be mentioned in the record for six months continuously.
> ME: You mean to say that the patient should go –
> ALJ: It has to be there for six months. Each one of them. Any of the four that are there . . . .

(A.R. 263.)  The ALJ further instructed Dr. Buganza that he could only consider the clinical findings of the doctor, and not Plaintiff's self-reported complaints:

> [w]e have to look at her clinical findings . . . . Not by history. Not what the claimant says. It's the clinical findings of the doctor. Not what's reported to the doctor. It's the examination that we look at . . . . It has to be clinically tested. A claimant – a patient can report anything that may or may not be accurate. It's the clinical examination of the doctor that counts . . . . We need the clinical exam. You know? That's what the Agency now looks to as buttressing evidence. The clinical examination of the doctor. It's the only thing we can go by.

(A.R. 263-67.)  Ms. Barish, on more than one occasion, objected to the ALJ's refusal to consider Plaintiff's self-reported complaints, as recorded in both Dr. Levine's progress notes and her notes.  (A.R. 268, 273.)

When Ms. Barish attempted to cross-examine Dr. Buganza by asking him whether he had the impression that Plaintiff had CFS, the ALJ refused to permit her question and instead interjected the following question: "Doctor, do you have, with a reasonable degree of medical certainty, just from the record, without examining the claimant, can you tell me whether you have a medical opinion, with a reasonable degree of medical certainty, whether she does or does not, in fact have a chronic fatigue – can you tell that?  With a reasonable degree of medical opinion?"  Dr. Buganza replied, "I would say yes.  Because, you know, then if you ask me if she fits this criteria probably I'm not able to give you this.  But I would

say that based –." (A.R. 268, 270.)  The ALJ interrupted Dr. Buganza and did not permit him to finish his answer.  (A.R. 271.)

### 4.    Other Medical Evidence

#### a.    Robert S. April, M.D.

On July 10, 2001, Dr. Robert S. April examined Plaintiff for complaints including extreme physical weakness, chills or tremors, poor sleep, gait imbalance, dizziness, fever, weight loss, and inability to focus.  (A.R. 144.)  Under the "Social History" category, Dr. April found no "bonafide weakness."[2] (A.R. 144.)  The neurological examination revealed that Plaintiff's sensation was intact, that Babinski and Romberg signs were negative, and that there were no signs of hyponutrition and no cranial nerve, motor, reflex, or gait abnormalities.  (A.R. 144.)  Accordingly, Dr. April concluded that "[t]here are many multisystem symptoms but no neuromuscular ones."  (A.R. 144.)  However, based on Dr. Levine's comments and laboratory tests, Dr. April requested a referral for an electromyography / nerve conduction study ("EMG").  (A.R. 144.)  It appears that the EMG revealed no neuromuscular abnormality and a normal nerve conduction.  (A.R. 145.)

#### b.    Orthopedist Mohammad Khattak, M.D.

On February 6, 2002, orthopedist Dr. Mohammad Khattak[3] examined Plaintiff as a consultative examiner.   (A.R. 77-78.)   Dr. Khattak found that Plaintiff's orthopedic condition was normal.  (A.R. 77-78.)  He found no limitations in bending, sitting, standing, walking, lifting, carrying, or reaching with gross and fine manipulations in her hands.  (A.R.

---

[2]It is unclear what, specifically, Dr. April was referring to when he stated that there was no bonafide weakness.

[3]In the ALJ's decision, he referred to Dr. Mohammad Khattak as Dr. Mohammad Seo. (*See* A.R. 3L.)

78).  It does not appear that Dr. Khattak conducted a thorough examination of Plaintiff, or a

thorough review of Plaintiff's medical history.[4]

### c.      Psychiatrist Eugene Allen, M.D.

On March 7, 2002, Dr. Eugene Allen performed a psychiatric consultative

examination of Plaintiff.  (A.R. 86-87.)  Dr. Allen found that Plaintiff was neatly dressed

and exhibited good relatedness and eye contact.  (A.R. 86.)  Her speech was relevant and

coherent, and her mood and affect were normal.  (A.R. 86.)  Plaintiff's recent memory,

insight, and judgment were good.  (A.R. 87.)  Dr. Allen diagnosed a depressive disorder, but

found no psychopathology and no limitations in Plaintiff's ability to function.  (A.R. 86-87.)

Dr. Allen concluded that "[t]he allegations of this claimant are consistent with the findings

of the interview, in my opinion."[5]  (A.R. 87.)  He further stated, "In my opinion, the

---

[4]The court notes that, in *Lamar v. Barnhart*, 373 F. Supp. 2d 169, 176 (E.D.N.Y. 2005), the ALJ there had relied on findings made by Dr. Khattak, who had found that the plaintiff there also had no limitation on his ability to sit, stand, walk, lift, or carry.  United States District Judge Nicholas G. Garaufis stated that "Dr. Khattak's findings [were] grossly inconsistent with the totality of evidence in the record" and that Dr. Khattak's report was "slipshod and specious."  *Id.* at 176-77.  He "question[ed] the state's continued reliance on Dr. Khattak's 'medical opinions'" and further stated that

> [c]ontrary to his duty as a medical professional, Dr. Khattak[] summarily concluded that the claimant had no limitation of function without conducting a thorough examination of the claimant or a thorough review of the claimant's medical history. Dr. Khattak's unsupported, Panglossian diagnoses thwart the ability of legitimately disabled individuals such as Lamar to receive the much-needed compensation to which they are entitled.

*Id.* at 177.  Judge Garaufis directed the Commissioner to forward a copy of his Memorandum and Order to the appropriate authorities of the State of New York for such official action as deemed appropriate.  Although unaware of the outcome of official action taken against Dr. Khattak, if any, the court is thoroughly mindful of Judge Garaufis' assessment of Dr. Khattak's credibility, or lack thereof, as a medical professional.

[5]While not entirely clear, it appears that Dr. Allen is saying, by this statement, that his findings were consistent with Plaintiff's complaints.  However, this statement seems inconsistent with the statement that follows.

claimant has a satisfactory ability to understand, carry out and remember instructions and a satisfactory ability to respond appropriately to supervision, co-workers and work pressures in a work setting." (A.R. 87.)

### d.    Non-examining Psychiatrist Carlos Gieseken, M.D.

On April 8, 2002, Dr. Carlos Gieseken, a New York state agency psychiatric consultant, completed a "Psychiatric Review Technique" form on Plaintiff, apparently based on Plaintiff's file. (A.R. 88-102.) He diagnosed a depressive disorder and anxiety, and found that Plaintiff had mild functional limitations. (A.R. 92, 94, 99.) Dr. Gieseken concluded that Plaintiff's mental impairment was not severe from a psychiatric standpoint and that she retained the ability to perform unskilled work. (A.R. 92, 94, 88.)

## II.    Discussion

### A.    Standard of Review

In reviewing a final decision of the Commissioner, a district court must assess whether substantial evidence supports the decision and whether the correct legal standards were applied. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) (citation omitted). "Substantial evidence" is defined as "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court must ask whether "the claimant has had a full hearing under the [Commissioner]'s regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation marks and citation omitted). This inquiry is essential due to the nonadversarial nature of a benefits proceeding; the judge himself is obligated to affirmatively develop the

record.  *Id* (citation omitted).  Moreover, when the applicant is not represented by counsel, "the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.  A reviewing court must determine whether the ALJ adequately protect[ed] the rights of [a] pro se litigant by ensuring that all of the relevant facts [are] sufficiently developed and considered."  *Id.* (internal quotation marks and citation omitted).

"To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Mongeur*, 722 F.2d at 1038.  The court also must "keep[] in mind that it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record."  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).  Indeed, in evaluating the evidence, "[t]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon de novo review."  *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation omitted).

After its review, the district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations."  *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (citations omitted).  When the record is "sufficiently complete and provides persuasive evidence of total disability, thus rendering further proceedings pointless

. . . the district court [should] award benefits itself and remand simply for calculation of such benefits." *Id.* (internal quotation marks and citations omitted).

**B.     Standards Governing Evaluation of Disability Claims by the ALJ**

An individual is "disabled" under the Act when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The individual's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The claimant bears the initial burden of proof of showing disability by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require.  42 U.S.C. § 423(d)(5); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

The Social Security Administration has established a five-step procedure for evaluating disability claims brought under the Act.  *See* 20 C.F.R. § 404.1520.  The procedure in the Second Circuit is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is

whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citation omitted). Once a claimant demonstrates, at step four, that he or she is unable to perform his or her past work due to a severe impairment, the burden then shifts to the Commissioner at step five to demonstrate that the claimant has a residual functional capacity to perform other gainful work in the national economy. *Id.* (citation omitted); *see also Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citation omitted).

### C. The ALJ's Findings and Plaintiff's Allegations of Error

The ALJ found here at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. (A.R. 3P.) At step two, the ALJ determined that Plaintiff's CFS was a severe impairment, as described in 20 C.F.R. § 404.1520(c). (A.R. 3P.) At step three, the ALJ found that Plaintiff's impairment did not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. (A.R. 3P.)

The ALJ reached thus reached step four, but concluded there that Plaintiff retained the residual functional capacity to perform her past relevant work. (A.R. 3P.) He explained that Plaintiff's "allegations regarding her limitations are not totally credible as they are not supported by the clinical and objective evidence of record." (A.R. 3P.) He further found that, despite Plaintiff's subjective complaints, she "retains the residual functional capacity to perform sedentary work or work that involves lifting ten pounds occasionally, walking two hours, standing two hours and sitting six hours out of an eight hour workday." (A.R. 3P.)

Finally, he stated that Plaintiff's "past relevant work as paralegal, proofreader, copy editor and production clerk did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565)." (A.R. 3P.) The ALJ accordingly concluded that Plaintiff's condition was not disabling under the Act. (A.R. 3P.)

Plaintiff argues that the ALJ erred in determining at step four that she retained the residual functional capacity to carry out past relevant work. She contends that his decision was based on an erroneous legal standard, as the ALJ failed to correctly apply Social Security Ruling 99-2p, 64 Fed. Reg. 23380 (Apr. 30, 1999). Plaintiff further argues that the ALJ erred when he determined that her allegations regarding her limitations were not credible. Finally, Plaintiff claims that she did not have a fair hearing, as the ALJ failed to adequately develop the record.

### D.    Social Security Ruling 99-2p

Social Security Rulings represent "precedent final opinions and orders and statements of policy and interpretations that [the Social Security Administration] has adopted." 20 C.F.R. § 402.35(b)(1). "They are binding on all components of the Social Security Administration." *Id.* Social Security Ruling 99-2P ("SSR 99-2p") provides guidance on "Evaluating Cases Involving Chronic Fatigue Syndrome (CFS)." *See* 64 Fed. Reg. 23380. Failure to properly apply SSR 99-2p in cases involving CFS is a ground for remand. *See, e.g., Persico v. Barnhart*, 420 F. Supp. 2d 62, 73-75 (E.D.N.Y. 2006).

SSR 99-2p defines CFS as "a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity [that is] characterized in part by prolonged fatigue that lasts 6 months or more and that results in substantial reduction in previous levels of occupational, educational, social, or personal activities." 64 Fed. Reg. at

23381.  According to SSR 99-2p, the Center for Disease Control and Prevention (the "CDC") definition for CFS requires

> the concurrence of 4 or more of the following symptoms, all of which must have persisted or recurred during 6 or more consecutive months of illness and must not have pre-dated the fatigue:
>
> Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities;
> Sore throat;
> Tender cervical or axillary lymph nodes;
> Muscle pain;
> Multi-joint pain without joint swelling or redness;
> Headaches of a new type, pattern, or severity;
> Unrefreshing sleep; and
> Postexertional malaise lasting more than 24 hours.

*Id.*

Although a CFS diagnosis can be based on an individual's reported symptoms once other possible causes for the symptoms have been ruled out, reported symptoms alone are insufficient for a determination of disability under the Act. *Id.* According to SSR 99-2p, the provisions of the Act, as well as the regulations promulgated thereunder, "require that, for evaluation of claims of disability under the Act, there must also be [1] medical signs or [2] laboratory findings before the existence of a medically determinable impairment may be established." *Id.*; *see* 42 U.S.C. §§ 423(d)(3); 1382c(a)(3)(D); 20 C.F.R. §§ 404.1508, 416.908.

With respect to medical signs that establish the existence of a medically determinable impairment for a disability claim under the Act, SSR 99-2p provides the following guidance:

> [f]or purposes of Social Security disability evaluation, one or more of the following medical signs clinically documented over a period of at least 6 consecutive months

establishes the existence of a medically determinable impairment for individuals with CFS:

Palpably swollen or tender lymph nodes on physical examination;
Nonexudative pharyngitis;
Persistent, reproducible muscle tenderness or repeated examinations, including the presence of positive tender points; or
Any other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record.

64 Fed. Reg. at 23382.

With respect to laboratory findings that demonstrate the existence of a medically determinable impairment under the Act, SSR 99-2p recognizes that there are currently no laboratory findings that are widely accepted as being associated with CFS. *Id.* "However, the absence of a definitive test does not preclude reliance upon certain laboratory findings to establish the existence of a medically determinable impairment in persons with CFS." *Id.* To the contrary, SSR 99-2p states, in pertinent part, that "[a]ny . . . laboratory findings that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record" may establish the existence of a medically determinable impairment in individuals with CFS. *Id.*

### E.     The ALJ's Application of Incorrect Legal Standards

The court holds that the ALJ misapplied SSR 99-2p. First, SSR 99-2p makes clear that CFS requires the concurrence of four or more symptoms that are listed in the ruling that have "persisted *or recurred*" during six or more consecutive months of illness. 64 Fed. Reg. at 23381 (emphasis added). Indeed, "occasional symptom-free periods - and even the sporadic ability to work - are not inconsistent with [Chronic Fatigue Syndrome]." *Reddick v. Chater*, 157 F.3d 715, 724 (9th Cir. 1998) (citation omitted). Yet, the ALJ, in describing the CFS criteria to medical expert Dr. Buganza, repeatedly stated that Plaintiff must have

four of the eight listed symptoms *continuously* for six months. (*See* A.R. 263-67.) For example, the ALJ stated,

> [Plaintiff] has to have four of the[ eight listed symptoms] concurrently, that is documented for six months in the record . . . . And they have to all exist at the same time. All of the four, of any of those, have to exist at the same time, and it must be documented . . . . You can't mention it once. It has to be mentioned in the record for six months continuously . . . . It has to be there for six months. Each one of them.

(A.R. 263.) Applying the ALJ's erroneous interpretation of the criteria, Dr. Buganza stated that Plaintiff did not suffer from at least four of the eight listed symptoms. (A.R. 266.)

Second, SSR 99-2p unambiguously permits the consideration of self-reported symptoms. Seven of the eight symptoms listed under the CDC definition *must* be self-reported in order for a doctor to be able to record them: muscle pain, multi-joint pain, headaches, unrefreshing sleep, postexertional malaise, sore throat, tender cervical or axillary lymph nodes. *See* 64 Fed. Reg. at 23381. Indeed, one of the eight listed symptoms explicitly permits self-reporting: "*[s]elf-reported* impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities." *Id.* (emphasis added). However, the ALJ inexplicably refused to permit Dr. Buganza to consider any self-reported data in making his determination of whether Plaintiff suffered from at least four of the eight listed symptoms. The ALJ informed Dr. Buganza,

> We have to look at [Dr. Levine's] clinical findings, okay? Not by history. Not what the claimant says . . . . Not what's reported to [Dr. Levine]. It has to be clinically tested. A claimant – a patient can report anything that may or may not be accurate. It's the clinical examination of the doctor that counts . . . . That's what the Agency now looks to as buttressing evidence. The clinical examination of the doctor. It's the only thing we can go by."

(A.R. 264-65.) Accordingly, Dr. Buganza did not consider any symptoms Plaintiff reported

to Dr. Levine or Ms. Barish, despite the fact that their notes consistently reflect Plaintiff's complaints of joint pain, unrefreshing sleep, postexertional malaise, and impairments in short-term memory and concentration.[6]  (*See* A.R. 128-41, 147-77, 180-210.)

Third, with respect to medical signs and laboratory findings, SSR 99-2p states that

the medical criteria [listed herein] are only examples of signs and laboratory findings that will establish the existence of a medically determinable impairment; they are not all-inclusive.  As progress is made in medical research into CFS, additional signs and laboratory findings may also be found that can be used to establish that individuals with CFS have a medically determinable impairment.  The existence of CFS may be documented with medical signs or laboratory findings other than those listed below, provided that such documentation is consistent with medically accepted clinical practice and is consistent with the other evidence in the case record.

64 Fed. Reg. at 23382.  To reinforce the foregoing statement, the listed medical criteria includes "[a]ny other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record."  *Id.* at 23382.  Similarly, the listed laboratory findings include "[a]ny other laboratory findings that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record."  *Id.*  Notwithstanding the foregoing language, the ALJ rejected laboratory reports reflecting that Plaintiff had "very low growth hormone" and a "markedly abnormal" result to a DHEA sulphate test, despite Dr. Levine's report that "a 'blunted' response to Growth Hormone stimulation [is] a common finding among a subset of patients with the Chronic Fatigue Syndrome."  (A.R. 113-19, 260.)  Moreover, during Dr. Buganza's testimony, Dr. Buganza attempted to cite a scientific article that apparently provided

---

[6]In his written decision, the ALJ further reiterated his rejection of self-reported symptoms: "[t]he record documents the claimant's subjective complaints of these symptoms; however the record does not document that she has suffered from 4 or more of these symptoms for six consecutive months."  (A.R. 3N.)

support for the link between low human growth hormone and CFS, but the ALJ summarily dismissed the article:

> ALJ: Has it been scientifically established that the elevation of this hormone has any connection to chronic fatigue syndrome?
> ME: That I don't know.
> ALJ: Because if it's not established, then it's worthless . . . . Let me see the language that you have there? There's a difference between a theory and an established – this is from an article. No. Listen to me . . . . [I]t seems likely this is not scientific data . . . . We have a criteria here. Okay? Forget this. This is not what you go by. All right? I'm charging you under the law that we have – the Social Security Administration has a specific set of criteria that someone with chronic fatigue syndrome must meet.

(A.R. 261-62.) At the very least, the ALJ was presented with sufficient information, from both Dr. Levine and Dr. Buganza, concerning a possible scientific link between low growth hormone levels and CFS to obligate him to explore the significance of Plaintiff's laboratory results. This obligation was particularly acute given the above-quoted language in SSR 99-2p permitting the possibility that other laboratory reports "consistent with medically accepted clinical practice and . . . consistent with the other evidence in the case record" may satisfy the medical criteria requirement for a finding of disability under the Act. Instead, the ALJ, without any studied inquiry, disregarded the laboratory report reflecting Plaintiff's low levels of growth hormone, and he simply wrote in his decision that there were "no laboratory findings to support chronic fatigue syndrome at this time." (*See* A.R. 3N.)

In addition, it appears that the ALJ did not consider data from Dr. Levine's notes reflecting that Plaintiff had palpably swollen and/or tender lymph nodes on multiple occasions. (*See* A.R. 147-77.) It is unclear whether this symptom was self-reported or was discovered through medical examination–if the latter, the data may satisfy the medical criteria requirement for disability under the Act, depending on the frequency of the

symptom. *See* 64 Fed. Reg. at 23382.

Accordingly, due to the ALJ's incorrect interpretation and application of SSR 99-2p, as described above, the Commissioner's decision is vacated, and this matter is remanded for additional proceedings.

### F.    The ALJ's Failure to Accord Proper Weight to Treating Sources

The opinions of treating sources are generally entitled to more weight than non-treating sources. 20 C.F.R. § 404.1527(d)(2); *see also Bischof v. Apfel*, 65 F. Supp. 2d 140, 146 (E.D.N.Y. 1999) ("An administrative law judge must give considerable weight to the opinions of the treating physicians."). When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2). If the ALJ does not give the treating source's opinion controlling weight, the ALJ must provide "good reasons" for the weight attributed to the treating source and, in so doing, must apply several factors, listed in 20 C.F.R. § 404.1527(d)(2)(i), (d)(2)(ii), and (d)(3) through (d)(6). *Id.* § 404.1527(d)(2). These factors include length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors. *Id.* § 404.1527(d)(2)(i), (d)(2)(ii), (d)(3)-(d)(6). "[A]n administrative law judge may not reject the opinions of treating physicians solely because they are based on a claimant's subjective complaints rather than specific medical signs or laboratory findings." *Bischof*, 65 F. Supp. at 146.

Although the ALJ briefly summarized both Dr. Levine's and Ms. Barish's findings and reports in his decision, he did not attribute controlling weight to either treating source's opinion.[7] Moreover, he entirely failed to apply the factors listed in 20 C.F.R. § 404.1527(d)(2)(i), (d)(2)(ii), and (d)(3) through (d)(6) to explain the weight he attributed to their opinions, except to state that "Dr. Levine supplied minimal clinical findings and no laboratory tests to support her conclusion." (A.R. 3O.) Given the duration and extent of both Dr. Levine's and Ms. Barish's treatment of Plaintiff, such an explanation is wholly insufficient.

The ALJ's central deficiency, with respect to the weight he attributed to Dr. Levine's opinion, was his failure to assess Dr. Levine's expertise in CFS. *See* 20 C.F.R. § 404.1527(d)(5). During the November 3, 2004 hearing, the ALJ repeatedly expressed his doubts as to whether Dr. Levine was an expert on CFS. (*See*, *e.g.*, A.R. 259.) However, he never sought to resolve his doubts on this point. Ms. Barish, as Plaintiff's non-legal representative at the hearings before the ALJ, attempted to establish Dr. Levine's expertise by stating that all of Dr. Levine's patients had CFS and that she herself suffered from CFS and was seeing Dr. Levine for her condition. (A.R. 275.) The following interchange ensued:

> ALJ: Listen to me. Listen to me. That is totally irrelevant. That does not enhance Dr. Levine as an expert in chronic fatigue. That doesn't mean anything.
> REP[resentative (Ms. Barish)]: What would?
> ALJ: Proof. Proof for me of what her history, in terms of education, background, and treatment of chronic fatigue patients, what she went through, how she specialized in it, what her specialty is, how is she Board certified, and everything else.
> REP: Would you be willing to speak with her?

---

[7]As the ALJ correctly noted, Ms. Barish, as Plaintiff's therapist, is an acceptable medical source pursuant to 20 C.F.R. § 404.1513(d)(1). (A.R. 3L.)

ALJ: No.  I mean, I'm not going to go talk to her on the phone.  I'm not going to call her.  Whatever is in evidence is in evidence.  Whatever she put in is there.  I don't make calls.  I don't do that.  I'm not allowed to do that.  I work with the file.  I'm not going on an expedition, you know. . . .

[Discussion concerning the ALJ's questions about Dr. Levine's Board certifications.]

REP: I don't know if this will be in evidence or not or valid.  But she is speaking at a conference on chronic fatigue syndrome this weekend in New Jersey.

ALJ: I'm not interested.

REP: Okay.

ALJ: I'm not going to any conference in Jersey.  That's not my job.

REP: No, no.  But I meant as far as validation of her expertise.

ALJ: No.  You tell her, if she wants, she has until Friday to submit copies of her certification in allergy, immunology, internal medicine, and infection [*sic*] disease.  Four separate Board certifications.  I want to see that.  If she wants.

(A.R. 275-77.)

As an initial matter, the court notes that the ALJ's intemperate, brusque and unhelpful responses to Ms. Barish's earnest attempts to represent Plaintiff, as reflected in the foregoing quoted dialogue, permeates the entire transcript of the November 3, 2004 hearing before the ALJ.  (*See* 246-48, 269-71, 272-75, 278-79.)  Although the ALJ appears here to provide a response to Ms. Barish's important legal question of how to establish Dr. Levine's expertise in CFS, his statements that he was "not allowed" to speak with Dr. Levine on the telephone[8] and that "Whatever is in evidence is in evidence.  Whatever [Dr. Levine] put in is there . . . .  I work with the file" suggest that the record was complete as is and that no additional evidence on Dr. Levine's expertise would be permitted or considered.

---

[8]It is unclear to the court why the ALJ believed that he was "not allowed" to speak with Dr. Levine on the telephone.  SSR 99-2p states that, "[i]f the adjudicator finds that the evidence is inadequate to determine whether the individual is disabled, he or she must first recontact the individual's treating or other medical source(s) to determine whether the additional information needed is readily available, in accordance with 20 CFR 404.1512 and 416.912."  64 Fed. Reg. at 23383.  It is further clear, under 20 C.F.R. § 404.1512(e)(1), that the ALJ may contact a treating source by telephone.

What is most curious and perplexing to the court is that, rather than directing Plaintiff to either produce Dr. Levine to testify at the hearing or to submit evidence concerning Dr. Levine's expertise, the ALJ requested that Dr. Levine submit copies of her certifications in allergy, immunology, internal medicine, and infectious disease to resolve questions he had about her Board certification in those areas. (A.R. 276-77.) Indeed, it was Plaintiff's burden to present any evidence necessary to support her claim.[9] *See* 20 C.F.R. § 404.1512. However, at the time of the hearings before the ALJ, Plaintiff was not represented by legal counsel, and her representative, Ms. Barish, openly requested guidance from the ALJ on how to legally establish Dr. Levine's expertise. The ALJ was duty-bound to answer, guide, and even instruct Ms. Barish on this point in order to satisfy his obligation to affirmatively develop the record, particularly for a claimant not represented by legal counsel. *See Echevarria*, 685 F.2d at 755.

Accordingly, the ALJ failed to properly explore and develop the record on the issue of Dr. Levine's expertise in CFS. On remand, the ALJ is directed to admit and consider evidence on this issue. If, on remand, the ALJ decides not to attribute controlling weight to either Dr. Levine's and/or Ms. Barish's opinions, he must provide "good reasons" for his decision, applying the several factors listed in 20 C.F.R. § 404.1527(d)(2)(i), (d)(2)(ii), and (d)(3) through (d)(6). *See* 20 C.F.R. § 404.1527(d)(2).

---

[9]Plaintiff has submitted to this court documentary evidence purporting to establish Dr. Levine's expertise in CFS. *See* Attachments to Plaintiff's Letter to Court dated May 2, 2006. Plaintiff and her present counsel are advised that, when submitting documents as evidence for a court to consider, the documents must be accompanied by a duly executed affidavit by someone who can attest, based on personal knowledge, that the documents are what they purport to be. *See* Fed. R. Evid. 901.

### G.     The ALJ's Adversarial Questioning of Dr. Buganza

Social security benefits proceedings, by nature, are nonadversarial. *Echevarria*, 685 F.2d at 755. The ALJ's role, particularly when a claimant is not represented by legal counsel, is to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Robinson v. Sec'y of Health & Human Servs.*, 733 F.2d 255, 258 (2d Cir. 1984) (citation omitted).

Here, the ALJ's questioning of medical expert Dr. Buganza was a study in combative questioning, which hampered the truth seeking process. The ALJ repeatedly interrupted Dr. Buganza as he attempted to answer the ALJ's questions. (*See* A.R. 263-67.) Moreover, the ALJ asked leading questions in order to elicit the responses he apparently wanted or expected to hear, and yet he offered the caveat "I don't want to put words in your mouth . . . . You're the doctor. You're the expert. You got to tell me." (A.R. 267.) The ALJ even appeared to be offering his own testimony regarding what he observed from Dr. Levine's records; it is telling that, during Dr. Buganza's testimony, the ALJ spoke far more about *his* observations concerning Dr. Levine's records than Dr. Buganza did. (*See* A.R. 263-67.) When Ms. Barish attempted to cross-examine Dr. Buganza, the ALJ repeatedly interrupted, effectively preventing Ms. Barish from completing her cross examination. (A.R. 268-70.) At one point, Dr. Buganza appeared to state that he believed Plaintiff did suffer from CFS. (A.R. 270.) The ALJ interrupted him in the middle of his response, stating, "That's not what this–you have to meet the criteria." (A.R. 270-71.) In objection to the ALJ's interruption, Ms. Barish asked the ALJ, "Can he finish what he's saying?" (A.R. 271.) The ALJ responded, "No, I'm finished. I'm, I'm, I'm examining." (A.R. 271.)

The ALJ's method of questioning Dr. Buganza was a far cry from satisfying his obligation to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  *See Robinson*, 733 F.2d at 258.  Furthermore, his persistent interruptions of Ms. Barish's cross-examination of Dr. Buganza, which resulted in virtually no cross-examination at all, prevented the record from being adequately developed, particularly with respect to Dr. Buganza's expertise in th area of CFS.  Given that the ALJ clearly relied heavily on Dr. Buganza's testimony, the Commissioner's decision is also vacated for the reasons stated in this subsection, and remanded for proper development of Dr. Buganza's testimony.

### H.    Plaintiff's Credibility

The court briefly notes, with respect to the issue of Plaintiff's credibility, that the ALJ summarily determined that Plaintiff was not entirely credible.  (A.R. 3N.)  He based his determination on the fact that Plaintiff testified that she collected unemployment benefits, which was only possible because she had affirmed that she was ready, willing and able to work.  (A.R. 3N.)  While Plaintiff's affirmation in this regard is one factor to be considered in assessing her credibility, it alone does not constitute substantial evidence of Plaintiff's general lack of credibility.

The ALJ also based his determination on the fact that Plaintiff arrived at her consultative examinations with Dr. Buganza and Dr. Allen alone by bus, and on her testimony that she was able to perform self care and stayed home watching television, listening to music, and performing light household chores.  (A.R. 3N.)  These facts alone do not substantially establish Plaintiff's lack of credibility.  According to SSR 99-2p, "[t]he medical signs and symptoms of CFS fluctuate in frequency and severity."  64 Fed. Reg. at

23383. Plaintiff's intermittent ability to take care of herself, watch television, listen to music, and perform light household chores, when she felt well enough, is not necessarily inconsistent with CFS. *See Persico*, 420 F. Supp. 2d at 74 ("[T]he fact that plaintiff was, at some points during her alleged period of disability, able to shop, do dishes, perform self-care activities, and watch television should not foreclose a finding of disability due to CFS.").

On remand, the ALJ is directed to review and follow the section entitled "Assessing Credibility" in SSR 99-2P for guidance on appropriately assessing Plaintiff's credibility. *See* 64 Fed. Reg. at 23384.

### III.    Conclusion

The Social Security Act is a remedial statute which must be "liberally applied;" its intent is inclusion rather than exclusion. *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975). Consistent with that view, "courts have not hesitated to remand for the taking of additional evidence, on good cause shown, where relevant, probative and available evidence was either not before the Secretary or was not explicitly weighed and considered by him, although such consideration was necessary to a just determination of a claimant's application." *Id.*

Accordingly, for all of the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, and Plaintiff's motion for judgment on the pleadings is granted, to the extent that this matter is remanded to the Commissioner for further evidentiary proceedings consistent with this Opinion and Order.

SO ORDERED.

DATED:      Brooklyn, New York
            August 18, 2008

_____
         /s/
      DORA L. IRIZARRY
      United States District Judge